UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIGIPROTECT USA CORP.,

    *Plaintiff*,

v.

DOES 1 – 240,

    *Defendants.*

No. 10-cv-008760-PAC-HP

**DECLARATION OF MONICA MOSLEY**

I, Monica Mosley, hereby state as follows:

    1.    I am Counsel, Privacy and Law Enforcement, for Comcast Cable Communications Management, LLC ("Comcast")[1], located at 1701 JFK Boulevard, Philadelphia, Pennsylvania, 19103.  I am responsible for supporting and offering direction to the internal Comcast department that responds to civil and criminal subpoenas, warrants and orders that are served on Comcast seeking information respecting Comcast's video, Internet and telephony subscribers.  I have personal knowledge of the facts set forth herein.

    2.    On or about November 30, 2010 Comcast received an Order and a subpoena from the Plaintiff in this action seeking customer identification information for 96 Internet protocol ("IP") addresses corresponding to Comcast subscribers who allegedly infringed Plaintiff's copyright by downloading a certain audiovisual work via the Internet (the "Subpoena").  Attached hereto as Exhibit A is a true and correct copy of the Subpoena and Order.  The Subpoena was captioned with this case and case number but issued by the New Jersey federal district court and commanded a response by December 28, 2010.  The Subpoena was served on the Comcast Legal Response Center (the "LRC") at its Moorestown, NJ location where

---

[1] This is the proper entity although it is not the one that was served with the subpoena.

subpoenas and similar legal requests are processed and which is the internal department I support.

3. In the normal course of its business, Comcast processes approximately 200 court orders, subpoenas and/or warrants requesting subscriber identification information per business day. Based on the number of analysts employed by Comcast who process such requests, each analyst processes approximately 22 requests per day. Additionally, as part of Comcast's quality control measures, each analyst reviews the work of another analyst each day.

4. Given their time-sensitive nature, all emergency and law enforcement requests are given priority and dealt with expeditiously. For example, such requests often involve an imminent threat of death or injury or the imminent flight of a suspect, and often require compliance within less than an hour after receiving the request. As such, Comcast does not and cannot devote 100% of its time each day to civil requests. Additionally, new incoming civil requests need to take their place in line behind those that were served earlier.

5. Many civil requests, such as the information sought in the Subpoena in this proceeding and in others pending in this and other courts, seek identifying information for subscribers who use Comcast's Internet services and allegedly used peer-to-peer ("P2P") or similar services or applications for accessing or downloading music or movies in violation of copyright law. Importantly, Comcast has no independent knowledge or information as to the truth of any allegations concerning the legality or illegality of any allegedly downloaded or copyrighted materials, because such P2P communications are between a Comcast user and other individuals, and the files are not stored on any of Comcast's servers.

6. The process for linking subscriber accounts to IP addresses – or performing a "look-up" – is time consuming. In most instances where a request seeks information concerning

the use of an IP address controlled by Comcast, Comcast is able to identify which subscriber account was assigned a particular IP address on a specific date at a specific time.  However, because IP addresses are dynamically assigned and users can change day-to-day (and within a day), Comcast has to consult its logs for each date and time associated with each IP address to determine the identity of the subscriber account assigned to that IP address.  The logs identify a specific numerical address for a cable modem and then Comcast has to consult its subscriber database(s) to see which subscriber has that modem registered to his or her account.  Whether an IP address links to a subscriber account already identified in connection with another look-up, or does not link at all, the look-up process for identifying an IP address is the same whether or not it produces unique identifying information.  In addition, if the requests concern IP address usage more than 180 days prior to the request, Comcast cannot identify a dynamic IP subscriber as logs are only maintained for a period of 180 days; however, Comcast must go through the entire process to look up the IP address because business class static IP addresses are available more than 180 days back and there is no identification on the Subpoena as to what type of subscriber the IP belongs to.  Hence the same amount of work is put forth in the initial identification process.

7.   Additionally, in the civil context, because Comcast is a cable operator, it is required under federal law to give notice to any subscriber whose identity is sought *before* any disclosure is made, so the subscriber may take measures to prevent the disclosure of his or her identity.  In order to expedite the notification process to comply with such requests, and to have confirmation of delivery of the notice, Comcast makes the required notifications by overnight mail.

8.   The pure cost to Comcast associated with each IP address look-up is approximately $120 per address.  This includes the look-ups through two systems, Comcast's

labor to confirm authenticity and accuracy, notification by overnight mail, quality control review, and interaction with responding subscribers and publication to the plaintiff via facsimile or CD.  The approximate cost breakdown is as follows:

- $95.00 Administrative Processing (Ticket creation, IP resolution to modem and subscriber, quality control, outgoing notification to subscriber, interaction with subscriber, formal response, ticket closure)

- $25.00 Overnight mail notification (averaged based on varied rates to zones nationwide)

Because look-ups of IP addresses that end up not linking to a subscriber account do not require notification to or future interaction with any subscriber or their attorney, the cost associated with such IP addresses is approximately half or $60 per look-up.

10.     After Comcast was served with Plaintiff's Subpoena, I engaged in discussions with Britton Patton, Plaintiff's counsel, in an attempt to reach an agreement as to the timing and scope of Comcast's response.

11.     In the course of these discussions and email exchanges with myself and others at the LRC, I advised Mr. Patton that Comcast would commit to perform, on a 30-day rolling basis, 25 IP address look-ups per 30-day cycle, and to provide a response in connection with each set of 25 IP addresses within 30 days of the date of the look-up performed for those specific addresses. I also offered that Comcast is trying to achieve the capability to ramp up the response number to at least double by the end of the first quarter of 2011, as Comcast is making every effort to increase staffing and have its personnel trained and screened to handle the onslaught of copyright infringement orders it receives weekly that were not forecasted for its 2010 budget.

12.     I also advised Messrs. Patton and Moskin that Comcast would preserve its records for all of the IP addresses listed in the Subpoena so that the rolling responses would not cause

information related to IP addresses to go beyond Comcast's 180 day retention policy and the plaintiff would not lose any available information.

13. Additionally, given the significant expenditure of time and resources Comcast will incur in connection with responding to the Subpoena, Comcast requested that Plaintiff reimburse the estimated associated costs in connection with Comcast's response. In exchange for the courtesy of accommodating a response time frame that Comcast's staff could manage over time, I offered to bring the cost per look-up down to $95 from $120, and $35 for each IP address that does not link at all.

14. I explained to Mr. Patton that the 25 look-ups per month would, of course, be in addition to the various other requests for information Comcast processes on a daily basis. In response to the recent onslaught of this and similar subpoenas, Comcast has already had to hire personnel not forecasted when it budgeted for 2010, and has incurred significant expense paying for overtime work. I explained that this increase in volume is the maximum amount that Comcast's analysts can reasonably perform, even with the increased personnel and overtime hours.

15. In spite of our efforts to reach an amicable production agreement, no specific agreement was reached as to the amount or timing of reimbursement of Comcast's costs or a limit on the number of monthly look-ups. Accordingly, I instructed counsel to Comcast to serve Plaintiff with a formal written objection to the Subpoena. Attached hereto as Exhibit B is a true and correct copy of Comcast's December 13, 2010 objection letter.

16.     Because Comcast will be unduly burdened by the expenditure of significant resources in responding to the Subpoena and any future subpoenas, Comcast has no choice but to seek to quash the Subpoena, to modify the Court's November 23rd Order with respect to any future subpoenas, and to seek a protective order governing any future subpoenas.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: December 20th, 2010.

Monica Mosley